## Evans *vs.* Gregory, &c.

### APPEAL FROM MUHLENBURG CIRCUIT.

PET. EQ.

Case 37.

1. The owner of a dower right in a slave took the slave on a flat boat to New Orleans, in the State of Louisiana, and brought him back to Kentucky. Held—that the taking of the slave out of the State for a temporary purpose, and returning to the State, was not a forfeiture of the dower estate in the particular slave, or of others held in the same right, within the meaning of the statute.
2. The owner of the dower right in a slave permitted the slave to go at large and hire himself on steamboats, and knew of his changing his name, and used no means for his recovery. The slave ultimately escaped. Held—that he was responsible to those in remainder for the value of their reversionary interest in the slave.

The facts of the case are fully stated in the opinion of the court.—*Rep.*

*James Harlan*, for appellant—

The decree rendered by the court below should be reversed, with directions to dismiss the bill of complainants.

1. As respects the slave, Austin. Six or seven years before the institution of this suit, Evans went to New Orleans in a flat boat, and took Austin with him, as a hand, to aid in navigating the boat. The slave returned to Kentucky with his master, and has ever since been in his possession. Is this such a *removal* from the State as forfeits the title in dower? The *removal* of slaves held by dower right contemplated by the 26th section of the act of 1797, (2 *Stat. L.* 1545,) is a permanent, not a temporary removal. In this case, the slave accompanied his master on a trip of business to another State, intending to return so soon as the business should be transacted. No wrong or injury was done to those entitled to his services after the termination of the dower estate, because he returned in safety to his home in this State. A tenant in dower of slaves has the same right to their services, during the existence of the estate, as he who has the absolute right, except to remove them permanently beyond the limits of the State.

2. The evidence is insufficient to authorize a decree against Evans for the value of the slave, Henry. Evans took as much care of him as if he had been his own property. It is customary to hire slaves on steamboats; and although Henry ranaway and has never been captured, Evans should not be held responsible for his value. A hirer of a slave is not responsible if he run away, unless a clear case of negligence is proven. (*Singleton vs. Carroll*, 6 *J. J. Marshall*, 531.)

3. But if Evans is responsible for Henry, it is not for his full value, but only for the value in reversion. The Circuit Court rendered a decree for his full value. For this cause alone, the decree should be reversed.

4. I do not deem it necessary to discuss the question as to the other dower slaves. None of them were ever beyond the limits of the State, and there is no reasonable ground to insist they are forfeited to the reversioners.

*Robinson & Johnson*, for appellees—

1. The question arising is, whether there was such a removal of Austin and Henry, out of the State, as to forfeit them to the reversioners?  2. Whether such removal forfeited all the dower slaves? 3. Whether Evans was guilty of such acts of omission or commission as to render him liable to the reversioners for the value of Henry?

On the first question, the only matter requiring consideration is, whether or not a temporary removal operates as a forfeiture under the statutes?

There are two statutes on this subject; first, the statute of 1797. (*Secs.* 25 *and* 26, 2 *Stat. Law*, 1545.) This applies alone to the widow; and any husband she may marry, removing or voluntarily permitting to be removed out of this State, a dower slave, forfeits the whole interest of the widow, or of her husband in all the dower slaves.  The other statute is the act of 1835, which applies, not only to the widow and her husband, but to any purchaser of dower slaves, and forfeits the slave removed and no more; but gives the Court of Chancery power at the suit of the reversioner, for sufficient cause shown, to require bond with security for the forthcoming of the slaves at the termination of the dower estate.  (3 *Stat. Law*, 553.)

Neither of the statutes referred to, define what removal out of the State shall forfeit the slaves. Not being limited to a permanent removal, it embraces all kinds of removal, whether temporary or permanent.  The right of the reversioner is endangered, whether the removal be temporarily or permanently.  Such removal facilitates escapes of slaves from their owners, by increasing their acquaintance with the means and facilities of travel, and gives opportunities for making arrangements for escape. Such removals render it more difficult and expensive for the reversioners to establish their rights, and protect them.  If the slave, while out of the State, is misused or escapes by the negligence of the person

having the possession, or perishes by his wilful act, it is more difficult and expensive to obtain the proof. The statute, therefore, prohibits their being removed at all; and requires, that during the existence of the dower estate they be kept within the Commonwealth, and subject to the jurisdiction of its laws. It seems plain that a temporary removal of dower slaves comes within the provisions of the statute.

Another question might have arisen upon this point, had the statute of limitations been relied on, in regard to the forfeiture arising from the removal of Austin, which was more than five years before the suit was brought. We are not prepared to contend that the statute of limitations will not bar a suit brought to enforce the forfeiture; but it is a well settled rule, that the court will not regard the statute of limitations unless it is relied on. If this is answered affirmatively, it will not be material to consider the effect of time, in regard to the removal of Austin. Henry was hired to Coleman as a hand on the steamboat Saladin, engaged in a trade out of the State. This was clearly a permission to remove Henry out of the State. The hiring of a slave on a steamboat, the regular business of which is to go out of the State, is not merely a permission to take the slave out of the State, but amounts to an actual sending him out of the State. Assuming, then, that Henry was removed out of the State of Kentucky, in such a manner as to create a forfeiture of him, the question arises, was that a forfeiture of all the slaves held by Evans as dower slaves? The statute of 1835 does not expressly repeal that of 1797. To operate as a repeal, its provisions must be inconsistent with those of the first statute. No such inconsistency exists. They both create a forfeiture, and both a forfeiture of the slave actually removed. This was as great a forfeiture as could properly be denounced for a removal by a purchaser. His removal of a slave purchased, should not produce a forfeiture of

the widow's right to the remaining slaves unsold or sold to other purchasers; and we presume the principal object of the statute of 1835 was to embrace purchasers from the widow or her husband, who were not embraced by the act of 1797. In addition, there are cases of forfeiture under the act of 1835, which would not be a forfeiture under the act of 1797. To produce a forfeiture under the act of 1797, there must be a "removal or voluntary permission of removal of a slave." Under that of 1835, to "cause, permit, or suffer to to be removed a dower slave," produces a forfeiture of the slave so suffered to be removed. Under the act of 1835, a mere *omission* in not preventing a removal, will produce a forfeiture. Under the act of 1797, it must be an act of *commission*. So that the statutes may well stand together, and are not in any degree inconsistent with each other.

3. The main question is, whether Evans was rightly made responsible for the value of the slave Henry? If the slave is lost to the reversioners by the negligence or the illegal acts of the tenant for life, he is responsible to the reversioners for the loss. The following acts of negligence are proven: 1. That he gave Henry a general pass to go where he pleased, and trade for himself; and when under that pass, he. was passing himself off as a freeman, under an assumed name, and therefor arrested by one of the reversioners, and brought home to Evans, he did not deprive him of his general pass, and, although warned, hired him on a steamboat, which offered him ample means of escape.

2. For a long period he gave Henry extraordinary liberties, such as gave great facilities for escape, and prevented his being arrested. When a boy is often seen on steamboats, going about without control, they are presumed to be free, and and pass unquestioned: Evans was frequently warned on the subject.

EVANS.
*vs.*
GREGORY, &c.

We ask for an affirmance of the decree on the appeal, and a decree for the surrender of the remaining slaves to the appellees.

January 15.

Judge SIMPSON delivered the opinion of the Court—

The appellant being possessed, in right of his wife, of some dower slaves, took with him, some eight or nine years since, two of said slaves, as hands on a flat boat, to the city of New Orleans, and brought them both back again with him, when he returned to his residence in this State. It appears that they were not taken out of the State by him, for any other purpose than that of assisting him to take the boat to market, and with the intention of bringing them home with him, so soon as the object of the trip was accomplished. He subsequently hired one of the same slaves at Louisville, to the captain of the steamboat Saladin, as a hand on that boat, which was at the time engaged in the St. Louis trade. After remaining on the boat for some months in the service for which he was employed, the slave ran away, and has finally escaped. He had been previously furnished by the appellant, with a writing authorizing him to go to Louisville and hire himself out, under which he had acted for sometime. And the appellant, notwithstanding he was informed that the slave had assumed a false name and pretended to be free, still permitted him to go at large, and failed to exercise over him, that controlling restraint, which was necessary to prevent his escape, and which the law of the land required at his hands.

The appellees, who are the owners of the reversionary interest in these dower slaves, brought this suit in chancery, and alleged, in their bill, the foregoing facts. They insisted that the dower estate in all the slaves had been forfeited, and prayed that the appellant should be required to surrender those that were in his possession, and that a decree might be rendered against him for the value of the one that had escaped.

The Circuit Court rendered a decree against him, for the value of the slave that ran away, and had made his escape, and for the surrender of the possession of the other one, that had been taken by him on the trip to New Orleans, the estate for life therein being regarded as having been thereby forfeited. From that decree he has appealed to this court. The appellees have prayed a cross appeal, and contend that the court below erred in not rendering a decree in their favor for all the dower slaves which the appellant has in his possession.

The principal question in the case is, whether the aforesaid acts of the appellant constitute such a *removal* of the slaves out of the State, as is prohibited by the statute.

These acts all occurred before the Revised Statutes took effect, but the languge used therein, and that used in the previous statutes on the same subject, is, so far as the question under consideration is concerned, precisely the same.

A removal out of the State, denotes, according to the usual signification of this language, an actual change of residence, and not a mere temporary absence. This is, undoubtedly, the sense in which it was used by the Legislature in these statutes. The appellant, when he took the flatboat laden with the produce of the country to the New Orleans' market, did not remove out of the State. As he took the slaves with him on the same business that engaged his attention, and they returned with him, if he did not remove out of the State, with what propriety can it be said that they were removed out of it by him? If a tenant in dower, residing near the Tennessee line, were to send one of the dower slaves to mill, or upon any other temporary business, into that State, would it be a removal of the slave out of this State under the statute? Surely it would not. The object of the Legislature was to prevent a change of residence. Such a change might endanger the rights of the reversioners, inasmuch as they might

EVANS
*vs.*
GREGORY, &c.

1. The owner of a dower right in a slave took the slave on a flat boat to New Orleans, in the State of Louisiana, and brought him back to Kentucky. Held— that the taking of the slave out of the State for a temporary purpose, and returning to the State, was not a forfeiture of the dower estate in the particular slave, or others held in the same right, within the meaning of the statute.

not be able to find the slaves, when the life estate should terminate. To prevent this evil, the person possessed of a dower estate in slaves was prohibited from removing the slaves out of the State. To make the prohibition effectual, a forfeiture of the dower estate was denounced by the statute. The Legislature could not have intended that the mere absence of the slave from the State, for a temporary purpose, by the consent of the tenant for life, not jeopardizing, in any degree, the rights of those who were entitled in reversion, should have the effect of working a forfeiture of the dower estate. The language used does not justify such a construction of the statute, nor is it required for the purpose of accomplishing the object the Legislature had in view in its passage, or to remedy the evil which it was intended to prevent.

We are of opinion, therefore, that neither the taking of the slaves to New Orleans, in the manner described, nor the hiring of one of them on the steamboat which was in the St. Louis trade, was such a removal of them, or either of them, out of the State as is prohibited by the statute. Consequently, no forfeiture of the dower estate was incurred by these acts.

But if a tenant in dower permit the dower slaves to go out of the State, or to be taken out, although not with a view to their removal, yet if it be done under such circumstances as are calculated to facilitate the escape of the slaves, and one does escape altogether, the owner of the life estate in the slave, may be responsible to the reversioners for the value of their estate therein. But such responsibility will depend upon the circumstances attending each case of the kind. In the present case the appellant is clearly responsible. He permitted the slave to leave his home in Muhlenburg county, and to go to Louisville and hire himself out. The act was illegal in itself, and its tendency was to furnish the slave with an opportunity to escape, if he desired to do so.

*2. The owner of a dower right in a slave permitted the slave to go at large and hire himself on steamboats, and knew of his changing his name, and used no means for his recovery. The slave ultimately escaped. Held —that he was responsible to those in remainder for the value of their reversionary interest in the slave.*

Besides, after the appellant had been apprized that the slave had assumed another name, and pretended to be free, he still extended to him the same indulgence, and permitted him to regulate, in a great degree, his own movements. He must be, therefore, responsible to the appellants for the value of their reversionary interest in the slave, but not for the whole value of the slave, inasmuch as he has himself lost the life estate of his wife therein.

Wherefore the decree is reversed, and cause remanded that a reference to a commissioner may be made, to ascertain the value of the reversionary interest in said slave, and for a decree in uniformity with this opinion.